**EXHIBIT E**

FABIAN EDWARDS, ET AL v. CITY OF HARTFORD, ET AL
Keith Mitto                                          4/11/2014

1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3   FABIAN EDWARDS, KENVILLE EDWARDS,   :
     KEITHMICHAEL MITTO and              :    CASE NO.
 4   ELIZABETH EDWARDS                   :    3:13-CV-00878-WWE
                                         :
 5   vs.                                 :
                                         :
 6   CITY OF HARTFORD, JAMES ROVELLA,    :
     OFFICER MATTHEW CORNELL,            :
 7   OFFICER CHRISTOPHER MAY and         :
     OFFICER ERIC BAUMGARTEN             :    APRIL 11, 2014
 8

 9             DEPOSITION OF:  KEITH MITTO

10
     APPEARANCES:
11
     EGAN, DONAHUE, VAN DYKE & FALSEY, LLP
12        Attorneys for the Plaintiffs
          24 Arapahoe Road
13        West Hartford, CT 06107
          (860) 232-7200
14   BY:  PETER M. VAN DYKE, ESQ.
          pvd@eddf-law.com
15
     HOWD & LUDORF, LLC
16        Attorneys for Defendants Cornell, May, Baumgarten
          65 Wethersfield Avenue
17        Hartford, CT 06114
          (860) 249-1361
18   BY:  ALAN R. DEMBICZAK, ESQ.
          adembiczak@hl-law.com
19
     OFFICE OF CORPORATION COUNSEL
20        Attorneys for Defendant Hartford, Rovella
          550 Main Street
21        Hartford, CT 06103
          (860) 757-9700
22   BY:  NATHALIE FEOLA-GUERRIERI, ESQ.
          feoln001@hartford.gov
23
                    Christine E. Borrelli
24                Connecticut License No. 117
                   Registered Merit Reporter
25
```

1  . . . . . . Deposition of KEITH MITTO, a Plaintiff, taken on

2  behalf of the Defendants, in the herein before entitled

3  action, pursuant to the Connecticut Practice Book, before

4  Christine E. Borrelli, duly qualified Notary Public in and

5  for the State of Connecticut, held at the Law Offices of

6  Howd & Ludorf, LLC, 65 Wethersfield Avenue, Hartford,

7  Connecticut, commencing at 12:25 p.m. on Friday, April 11,

8  2014.

9

10               S T I P U L A T I O N S

11

12      It is hereby stipulated and agreed by and among counsel

13  for the respective parties that all formalities in

14  connection with the taking of this deposition, including

15  time, place, sufficiency of notice, and the authority of the

16  officer before whom it is being taken may be and are hereby

17  waived.

18      It is further stipulated and agreed that objections

19  other than as to form are reserved to the time of trial.

20      It is further stipulated and agreed that the reading

21  and signing of the deposition transcript by the deponent is

22  hereby not waived.

23      It is further stipulated and agreed that the proof of

24  the qualifications of the Notary Public before whom the

25  deposition is being taken is hereby waived.

1   Q.   And was this a bathroom here, you're saying?

2   A.   Yes.

3   Q.   And then kitchen over here?

4   A.   Yes.

5   Q.   All right. So, let's go back to what you were
6   saying. So, you're saying you were upstairs. You hear this
7   commotion. Your friend comes up and says the police have
8   your brother and then you say you go downstairs?

9   A.   Yes.

10  Q.   And I think you said the first thing you see is
11  one officer on top of one of your brothers. Correct?

12  A.   Yes, Fabian.

13  Q.   And where are they?

14  A.   They are in the first floor doorway.

15  Q.   What exactly do you see? What is the officer
16  doing and what is your brother doing?

17  A.   The officer was on top of my brother by that time,
18  and I think he had -- at that time I think he only had the
19  taser out, I'm not sure. But by the time I took a quick
20  look over, I seen that cop on my brother on the floor. And
21  right in front of me there was Kenville and another cop.

22  Q.   When you saw Kenville and the other police
23  officer, what did you see? What was the officer doing and
24  was your brother doing?

25  A.   He was basically to the back, Kenville, towards

1  me, and the cop was behind him.
2      Q.   Okay.
3      A.   At that point, he had his arm like around his neck
4  and then I think his other arm was behind him and at that
5  time you could see him moving. You could see that he was
6  like squeezing real hard around his neck. I was like, what
7  are you doing to my brother. By that time, I think I
8  stepped out and he pushed him towards me.
9      Q.   So, you walk out and look to your left and see
10 Fabian in the hallway with an officer?
11     A.   Yes.
12     Q.   And then you also look straight ahead and you see
13 Kenville with a police officer behind him with and the
14 police officer has one of Kenville's arms behind him and the
15 officer has his other hand around Fabian's --
16         MR. VAN DYKE:  Kenville.
17         THE WITNESS:  Kenville.
18     Q.   (By Mr. Dembcizak)  I'm sorry.  Kenville's neck.
19     A.   It wasn't a regular hold that you guys see. It
20 was where you keep them from breathing. Basically, it was a
21 hold, a chokehold on his neck. He was basically up there
22 squeezing his throat.
23     Q.   So, was he holding his throat with his hand or
24 with his forearm?
25     A.   Forearm.

1  was happening?  Was the officer handcuffing him?  What was

2  going on?

3        A.    At that time, no.

4        Q.    So, what did you see exactly?

5        A.    Basically, if I can tell properly, he just was on

6  top of him holding him down on the floor.

7        Q.    Okay.

8        A.    I really wasn't focused at that point because I

9  was -- I know he was a big guy.  He was already down on the

10 floor.  But the only thing I was looking at more was Kirk

11 because he's a small person.  He had hand like someone was

12 squeezing his neck.

13       Q.    All right.  So, then when you say you looked over

14 at Kirk, you see what was going on, and I think you said the

15 officer pushed Kirk towards you?

16       A.    Yes.  By the time I stepped out, that's when -- a

17 little towards the doorway that's behind me, I stepped out

18 and then he pushed him towards my way.  I'm not sure why.

19       Q.    Okay.

20       A.    And then he pulled out pepper spray.  I seen the

21 whole motion, and I was like -- but I couldn't act in -- I'm

22 still shocked.  I'm like, what's going on.  By that time,

23 he's pulling it out and he goes like this and --

24       Q.    When you say "he goes like this," you have to

25 describe that for the record because when we read this back,

1  we won't know what "like this" means.
2       A.   Okay.  A quick motion.  He came with one motion
3  from his holster with the spray, the pepper spray.  He
4  pulled it out, straight out towards where I was, and then
5  sprayed me.  By that time, Kirk turned and -- he still got
6  pepper sprayed also.  And at that time, he pushed me into
7  the door and locked the door behind us.
8       Q.   All right.  Now, when you walked down, did you say
9  anything to either of the officers?
10      A.   No.
11      Q.   Did you say anything to the officer that had
12 Kenville?
13      A.   No.  The only thing I said is, what are you doing
14 to my brother, that's the only words that came out of my
15 mouth.
16      Q.   How many times did you say that?
17      A.   Two times.
18      Q.   Did the officer say anything in response?
19      A.   No.  He just kept on holding him at that point and
20 pushed me towards him.  And then I was still in the pathway
21 until I came out on the porch.
22      Q.   And when you walked out and you saw Fabian and
23 then you saw Kenville, was Kenville and the officer -- where
24 were they, on the top of the stoop, on the stairs?
25      A.   On top of the stoop.

1   Q.   On the top?

2   A.   Correct.

3   Q.   Is that yes?

4   A.   Yes, sorry.

5   Q.   So then after the OC spray, you're saying Kenville
6   pushes you in and closes the door behind you?

7   A.   Yes.

8   Q.   That would be that front door?

9   A.   Yes.

10  Q.   And then I think you said you both went upstairs?

11  A.   Yes.

12  Q.   And I think you said that you went to the
13  bathroom?

14  A.   Yeah, because he pushed me up towards the
15  bathroom, and he went to the sink.

16  Q.   Okay.

17  A.   When I entered the bathroom, I was basically
18  trying to get the contacts out first.

19  Q.   Okay.

20  A.   Then I was trying to flush my face, but it wasn't
21  working.  It just got worse.  So, then I decided to hop into
22  the shower, and I made it a whole lot worse.  At that point,
23  I couldn't breathe at all.  I tried to get out of the shower
24  and tried to, like, breathe.  And, actually, every time I
25  would take a breath in, nothing was coming out.  It was like

1    Q.   Did you have any problems with any of the police
2    throughout the booking process?
3    A.   Just -- I'm not even 100 percent sure because it's
4    been a while.  By the time we got into the police station,
5    they actually just directed us into another cell where other
6    people were, and then just had us wait there for a while.
7    Q.   Okay.
8    A.   At that time, my skin was actually burning, I
9    don't know why, for like a couple of days still from the
10   pepper spray.  I couldn't even sleep properly.  From here to
11   here, my arms was burning.  From here to here was burning.
12   Q.   When you say "from here to here," you're pointing
13   from elbows to your wrist?
14   A.   From forearm to forearm and from my hand, all that
15   was burning.
16   Q.   Okay.
17   A.   That's for both of my arms.
18   Q.   Okay.
19   A.   My face was, of course, still burning.  I couldn't
20   even lay properly.  I had to lay on my back because I
21   couldn't even touch my own skin on my body.  The shirt I had
22   on was filled with pepper spray still.  So, obviously, I
23   just slept like this, up.
24   Q.   All right.  Now, earlier I think we talked that
25   you have reviewed the police reports in this case.  Correct?

1  from the beginning of the school year until this week so
2  far.  From October 5 to October 26, 2012, Keith has
3  completed more than 30 hours of community service."  Do you
4  see that?
5       A.    Yes.
6       Q.    Does that sound about right, you did about 30
7  hours of community service?
8       A.    Yes.
9       Q.    This was the community service you did in exchange
10 for your charges being dismissed?
11      A.    Yes.
12      Q.    Now, as a result of this incident with the police,
13 did you sustain any personal injuries to your body?
14      A.    Other than the burning, the burning feeling from
15 the pepper spray, I did have, I think -- I'm not sure why,
16 but I had a pain in my head, like it was a hit or something,
17 but I wasn't able to tell because by that time I was already
18 pepper sprayed.  The only reason I felt that is when I got
19 into the cell and actually tried to rest my head, I felt
20 like a bruise.  I'm not sure from what, though.
21      Q.    But I just want to start with yes, you did sustain
22 personal injuries?
23      A.    Yes.
24      Q.    Now I want to identify the body parts.  Don't
25 describe it.  Just identify the body parts that were

```
 1  injured.
 2       A.   The left side of my head.
 3       Q.   Any other part of your body?
 4       A.   No.
 5       Q.   Nothing with your arms?
 6       A.   Not other than the paper spray.
 7       Q.   We're going to talk about that.  I'll put the
 8  burning from the pepper spray.  We will talk about that.
 9  Anything with your shoulders?
10       A.   No.
11       Q.   Anything with your legs?
12       A.   No.
13       Q.   Any bruises?
14       A.   No.
15       Q.   Any cuts?
16       A.   No.
17       Q.   Any abrasions?
18       A.   No.
19       Q.   No broken bones?
20       A.   No.
21       Q.   No stitches?
22       A.   No.
23       Q.   All right.  So, you said burning from the OC
24  spray.  Correct?
25       A.   Yes, sir.
```

1   Q.   And what was burning?  I know we talked about it.
2   You said your eyes?
3   A.   Eyes were burning.  Chest was burning.  Face was
4   burning.  Of course, the hair from where the spray was, also
5   forearms and hands.
6   Q.   Go ahead.  Any other parts?
7   A.   No, but it did continue more than the same day
8   that it happened.
9   Q.   That's my next question.  How long did this
10  burning last?
11  A.   It was like for a week-and-a-half.  But after that
12  week and during that week, I was able to touch my body, but
13  I could still fell the burning.  But for like a couple of
14  days, I couldn't even sleep properly because it was like my
15  body was really hot.
16  Q.   All right.  So, you had the burning from the OC
17  which lasted about a week-and-a-half, then it goes away?
18  A.   Yes.
19  Q.   And then it's completely resolved?
20  A.   Yes.
21  Q.   Now, you also said something about the left side
22  of your head.
23  A.   Yes.
24  Q.   What was that?
25  A.   It was a pain right here on my left side.  I'm not

1  sure what hit me, but it was like there from the time when I
2  was in the cell until when I got back home.
3      Q.  All right.  So, after, when you said you got back
4  home, did it eventually go away?
5      A.  Yes.
6      Q.  How long?
7      A.  A couple of hours or like a couple of hours into
8  the next day.
9      Q.  So, it sounds like the extent of your injuries was
10 the burning from the OC, which lasted about a
11 week-and-a-half?
12     A.  Yes.
13     Q.  And then a little bit of pain on the left side of
14 your head which lasted a couple of hours?
15     A.  Yes.
16     Q.  And then that's it?
17     A.  Yes.
18     Q.  I think -- actually, let me -- my understanding is
19 your interaction with the police consisted solely of your
20 brother being pushed into you?
21     A.  Yes.
22     Q.  And the OC spray?
23     A.  Yes.
24     Q.  The officers never touched you?
25     A.  From that point, I'm not sure because everybody

```
 1                    C E R T I F I C A T E

 2

 3         I, Christine E. Borrelli, a Notary Public and

 4   Licensed Court Reporter for the State of Connecticut, do

 5   hereby certify that the deposition of KEITH MITTO, was taken

 6   before me pursuant to the Connecticut Practice Book at the

 7   Law Offices of Howd & Ludorf, LLC, 65 Wethersfield Avenue,

 8   Hartford, Connecticut, commencing at 12:25 p.m. on Friday,

 9   April 11, 2014.

10         I further certify that the witness was first sworn

11   by me to tell the truth, the whole truth, and nothing but

12   the truth, and was examined by counsel, and his testimony

13   was stenographically reported by me and subsequently

14   transcribed as herein before appears.

15         I further certify that I am not related to the

16   parties hereto or their counsel, and that I am not in any

17   way interested in the events of said cause.

18         Witness my hand this 15th day of April, 2014.

19

20

21

22
                                    _____
23                                   Christine E. Borrelli
                                     Notary Public
24                                   CT License No. 117

25   My Commission Expires:
     June 30, 2016
```